**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA
450 Fifth Street NW
Washington, DC 20530

*Plaintiff*,

v.

GRAY TELEVISION, INC.
4370 Peachtree Road NE
Atlanta, Georgia 30319; and

RAYCOM MEDIA, INC.
RSA Tower 20th Floor
201 Monroe Street
Montgomery, Alabama 36104

*Defendants*.

## COMPLAINT

The United States of America, acting under the direction of the Acting Attorney General of the United States, brings this civil action against Gray Television, Inc. ("Gray") and Raycom Media, Inc. ("Raycom") to enjoin Gray's proposed merger with Raycom. The United States complains and alleges as follows:

## I. NATURE OF THE ACTION

1. Pursuant to an Agreement and Plan of Merger dated June 23, 2018, Gray plans to acquire Raycom through a merger transaction for approximately $3.6 billion in cash and stock.

2. The proposed merger would combine two of the largest independent local television station owners in the United States and would combine many popular local television

stations that compete against each other today in several markets, likely resulting in significant harm to competition.

3. In nine Designated Market Areas ("DMAs"), Gray and Raycom each own at least one broadcast television station that is an affiliate of one of the "Big 4" television networks: NBC, CBS, ABC, or FOX.

4. These nine "Overlap DMAs" are: (i) Waco-Temple-Bryan, Texas; (ii) Tallahassee, Florida-Thomasville, Georgia; (iii) Toledo, Ohio; (iv) Odessa-Midland, Texas; (v) Knoxville, Tennessee; (vi) Augusta, Georgia; (vii) Panama City, Florida; (viii) Dothan, Alabama; and (ix) Albany, Georgia.

5. In each Overlap DMA, the proposed merger would eliminate competition between Gray and Raycom in (i) the licensing of Big 4 network content ("retransmission consent") to cable, satellite, and fiber optic television providers (referred to collectively as multichannel video programming distributors, or "MVPDs"), for distribution to their subscribers; and (ii) the sale of spot advertising to advertisers interested in reaching viewers in the DMA.

6. By eliminating a major competitor, the merger would likely give Gray the power to charge MVPDs higher fees for its programming—fees that those companies would likely pass on, in large measure, to their subscribers. Additionally, the merger would likely allow Gray to charge local businesses and other advertisers higher prices to reach audiences in the Overlap DMAs.

7. As a result, the proposed merger of Gray and Raycom likely would substantially lessen competition in the markets for licensing Big 4 television retransmission consent in the Overlap DMAs, and selling broadcast television spot advertising in the Overlap DMAs, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

## II. THE DEFENDANTS

8. Gray is a Georgia corporation with its headquarters in Atlanta, Georgia. Gray owns 92 television stations in 56 DMAs, of which 83 stations are Big 4 affiliates. In 2017, Gray reported revenues of $883 million.

9. Raycom is a Delaware corporation with its headquarters in Montgomery, Alabama. Raycom owns 51 television stations in 43 DMAs, of which 45 stations are Big 4 affiliates. In 2017, Raycom earned revenues of more than $1 billion.

## III. JURISDICTION AND VENUE

10. The United States brings this action under Section 15 of the Clayton Act, 15 U.S.C. § 25, as amended, to prevent and restrain Defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18.

11. The Court has subject matter jurisdiction over this action pursuant to Section 15 of the Clayton Act, 15 U.S.C. § 25, and 28 U.S.C. §§ 1331, 1337(a), and 1345.

12. Defendants license Big 4 television retransmission consent to MVPDs, and sell broadcast television spot advertising to businesses (either directly or through advertising agencies), in the flow of interstate commerce, and such activities substantially affect interstate commerce.

13. Gray and Raycom have consented to venue and personal jurisdiction in this judicial district. Both companies transact business in this district. Venue is therefore proper in this district under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. § 1391(b)(1) and (c).

## IV. BIG 4 TELEVISION RETRANSMISSION CONSENT MARKETS

**A. Background**

14. MVPDs, such as Comcast, DirecTV, and Mediacom, typically pay the owner of each local Big 4 broadcast station in a given DMA a per-subscriber fee for the right to retransmit the station's content to the MVPD's subscribers. The per-subscriber fee and other terms under which an MVPD is permitted to distribute a station's content to its subscribers is set forth in a retransmission agreement. Retransmission agreements are negotiated directly between a broadcast station group, such as Gray or Raycom, and a given MVPD, and these agreements cover all of the station group's stations located in the MVPDs service area, or "footprint."

15. Each broadcast station group typically renegotiates retransmission agreements with the MVPDs every few years. If an MVPD and a broadcast station group cannot agree on a retransmission consent fee at the expiration of a retransmission agreement, the result is a "blackout" of the broadcast group's stations from the particular MVPD—i.e., an open-ended period during which the MVPD may not distribute those stations to its subscribers, until a new contract is successfully negotiated.

**B. Relevant Markets**

**1. Product Market**

16. Big 4 broadcast content has unique appeal to television viewers, as compared to the other content that is available through broadcast and cable stations. Big 4 stations usually are the highest ranked in terms of audience share and ratings in each DMA, largely because of unique offerings such as local news, sports, and highly ranked primetime programs. Viewers typically consider the Big 4 stations to be close substitutes for one another.

17. Because of Big 4 stations' popular national content and valued local coverage, MVPDs regard Big 4 programming as highly desirable for inclusion in the packages they offer subscribers.

18. Non-Big-4 broadcast stations are typically not close substitutes for viewers of Big 4 stations. Stations that are affiliates of networks other than the Big 4, such as the CW Network, MyNetworkTV, or Telemundo, typically feature niche programming without local news or sports—or, in the case of Telemundo, aimed at a Spanish-speaking audience. Stations that are unaffiliated with any network are similarly unlikely to carry programming with broad popular appeal.

19. If an MVPD suffers a blackout of a Big 4 station in a given DMA, many of the MVPD's subscribers in that DMA are likely to turn to other Big 4 stations in the DMA to watch similar content, such as sports, primetime shows, and local news and weather. This willingness of viewers to switch between competing Big 4 broadcast stations limits an MVPD's expected losses in the case of a blackout, and thus limits a broadcaster's ability to extract higher fees from that MPVD—since an MVPD's willingness to pay higher retransmission consent fees for content rises or falls with the harm it would suffer if that content were lost.

20. Due to the limited programming typically offered by non-Big-4 stations, viewers are much less likely to switch to a non-Big-4 station than to switch to other Big 4 stations in the event of a blackout of a Big 4 station. Accordingly, competition from non-Big-4 stations does not typically impose a significant competitive constraint on the retransmission consent fees charged by the owners of Big 4 stations.

21. For the same reasons, subscribers—and therefore MVPDs—generally do not view cable network programming as a close substitute for Big 4 network content. This is primarily

because cable channels offer different content. For example, cable channels generally do not offer local news, which offers a valuable connection to the local community that is important to viewers of Big 4 stations.

22. Because viewers do not regard non-Big-4 broadcast stations, or cable networks, as close substitutes for the programming they receive from Big 4 stations, these other sources of programming are not sufficient to discipline an increase in the fees charged for Big 4 television retransmission consent. Accordingly, a hypothetical monopolist of Big 4 television retransmission consent would likely increase the retransmission consent fees it charges to MVPDs by at least a small but significant amount.

23. The licensing of Big 4 television retransmission consent therefore constitutes a relevant product market and line of commerce under Section 7 of the Clayton Act, 15 U.S.C. § 18.

**2. Geographic Markets**

24. A DMA is a geographic unit for which A.C. Nielsen Company—a firm that surveys television viewers—furnishes broadcast television stations, MVPDs, cable and satellite television networks, advertisers, and advertising agencies in a particular area with data to aid in evaluating audience size and composition. DMAs are widely accepted by industry participants as the standard geographic areas to use in evaluating television audience size and demographic composition. The Federal Communications Commission ("FCC") also uses DMAs as geographic units with respect to its MVPD regulations.

25. In the event of a blackout of a Big 4 network station, FCC rules generally prohibit an MVPD from importing the same network's content from another DMA. Thus, Big 4 viewers in one DMA cannot switch to Big 4 programming in another DMA in the face of a blackout.

Therefore, substitution from outside the DMA cannot discipline an increase in the fees charged for retransmission consent for broadcast stations in the DMA. Each DMA thus constitutes a relevant geographic market for the licensing of Big 4 television retransmission consent within the meaning of Section 7 of the Clayton Act, 15 U.S.C. § 18.

**C. Likely Anticompetitive Effects**

26. The more concentrated a market would be as a result of a proposed merger, the more likely it is that the proposed merger would substantially lessen competition. Concentration can be measured by the widely used Herfindahl-Hirschman Index ("HHI").[1] Under the *Horizontal Merger Guidelines* issued by the Department of Justice and the Federal Trade Commission, mergers that result in highly concentrated markets (i.e., with an HHI over 2,500) and that increase the HHI by more than 200 points are presumed likely to enhance market power.

27. The chart below summarizes Defendants' approximate Big 4 television retransmission consent market shares, based on revenue, and the result of the transaction on the HHI in each Overlap DMA.[2]

| Overlap DMA | Gray Share | Raycom Share | Merged Share | Pre-Merger HHI | Post-Merger HHI | HHI Increase |
|---|---|---|---|---|---|---|
| Augusta, GA | 50% | 24% | 74% | 3,741 | 6,119 | 2,379 |
| Panama City, FL | 50% | 24% | 73% | 3,731 | 6,095 | 2,363 |
| Dothan, AL | 49% | 24% | 73% | 3,692 | 6,065 | 2,373 |

---

[1] The HHI is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers. For example, for a market consisting of four firms with shares of 30, 30, 20, and 20 percent, the HHI is 2,600 ($30^2 + 30^2 + 20^2 + 20^2 = 2,600$). The HHI takes into account the relative size distribution of the firms in a market. It approaches zero when a market is occupied by a large number of firms of relatively equal size, and reaches its maximum of 10,000 points when a market is controlled by a single firm. The HHI increases both as the number of firms in the market decreases and as the disparity in size between those firms increases.

[2] In this chart and the one below, sums that do not agree precisely reflect rounding.

| Tallahassee, FL-Thomasville, GA | 33% | 32% | 65% | 3,338 | 5,448 | 2,110 |
|---|---|---|---|---|---|---|
| Albany, GA | 33% | 32% | 65% | 3,339 | 5,440 | 2,101 |
| Toledo, OH | 25% | 24% | 49% | 2,504 | 3,710 | 1,206 |
| Waco-Temple-Bryan, TX | 25% | 24% | 49% | 2,503 | 3,687 | 1,184 |
| Knoxville, TN | 25% | 24% | 49% | 2,503 | 3,681 | 1,178 |
| Odessa-Midland, TX | 24% | 24% | 48% | 2,504 | 3,660 | 1,156 |

28. As indicated by the preceding chart, the post-merger HHI in each Overlap DMA is well above 2,500, and the HHI increase in each Overlap DMA far exceeds the 200-point threshold. Thus, the proposed merger presumptively violates Section 7 of the Clayton Act in each Overlap DMA.

29. In addition to substantially increasing the concentration levels in each Overlap DMA, the proposed merger would also enable Gray to black out more Big 4 stations simultaneously in each of the Overlap DMAs than either Gray or Raycom could black out independently today, increasing Gray's bargaining leverage against any MVPD whose footprint includes any of the Overlap DMAs, and likely leading to increased retransmission consent fees charged to such MVPDs.

30. Retransmission consent fees generally are passed through to an MVPD's subscribers in the form of higher subscription fees or as a line item on their bills. Broadcasters typically charge MVPDs uniform retransmission consent fees across an MVPD's entire footprint. Thus, higher fees resulting from increased leverage in the Overlap DMAs will likely be experienced by subscribers in any DMA where an affected MVPD retransmits at least one Gray Big 4 station, not just by those subscribers who live in the Overlap DMAs.

31. For these reasons, the proposed merger of Gray and Raycom likely would substantially lessen competition in the licensing of Big 4 television retransmission consent in each of the Overlap DMAs, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

## V. BROADCAST TELEVISION SPOT ADVERTISING MARKETS

### A. Background

32. Broadcast television stations sell advertising "spots" during breaks in their programming. An advertiser purchases spots from a broadcast station to communicate to viewers within the DMA in which the broadcast television station is located.

33. Gray and Raycom compete to sell broadcast television spot advertising in each of the Overlap DMAs.

### B. Relevant Markets

#### 1. Product Market

34. Broadcast television spot advertising possesses a unique combination of attributes that set it apart from advertising on other media. Broadcast television spot advertising combines sight, sound, and motion in a way that makes television advertisements particularly memorable and impactful. Additionally, broadcast television spot advertising reaches a large percentage of an advertisers' potential customers in a DMA, making it especially effective for promoting brand awareness.

35. Advertisers want to advertise on broadcast stations because they offer popular programming such as local news, sports, and primetime and syndicated shows that are especially attractive in reaching a broad demographic base and a large audience of viewers. Typically, an advertiser purchases broadcast advertising spots as one component of an advertising strategy that also includes other components—such as cable advertisements, newspaper advertisements, billboards, radio spots, and digital advertisements. Each component of the advertising budget targets a particular audience and serves a distinct purpose.

36. MVPDs sell spot advertising to be shown during breaks in cable network programming. For the following reasons, cable television spot advertising is an ineffective substitute for broadcast television spot advertising.

37. First, broadcast television spot advertisements typically penetrate about ninety percent of the households in a DMA, while cable television spot advertisements penetrate many fewer homes. A significant and growing number of television households do not subscribe to an MVPD at all, instead receiving broadcast television signals over the air for free. These households cannot see cable television spot advertisements. Even in households that do subscribe to cable television, the tier of service they receive almost always includes all broadcast channels but often excludes many cable channels. As a result, some cable television spot advertisements cannot be seen even by households that subscribe to MVPDs.

38. Moreover, households that have access to cable networks are divided among multiple MVPDs within a DMA. Although some MVPDs sell some spot advertising through consortia called "interconnects"—thereby allowing a cable television spot advertisement to reach more television households than it would through a single MVPD—household reach of cable television spot advertisements remains limited because not all MVPDs participate in interconnects.

39. Second, for many advertisers broadcast television spot advertising is a more efficient option than cable television spot advertising. Because broadcast television offers highly rated programming with broad appeal, each broadcast television advertising spot typically offers the opportunity to reach more viewers (more "ratings points") than a single spot on a cable channel. By contrast, MVPDs offer dozens of cable channels with specialized programs that appeal to niche audiences. This fragmentation allows advertisers to target narrower demographic

subsets by buying cable spots on particular channels, but it does not meet the needs of advertisers who want to reach a large percentage of a DMA's population.

40. Finally, MVPDs' inventory of cable television spot advertising is limited—typically to two minutes per hour—contrasting sharply with broadcast stations' much larger inventory. Due to the limited inventories and lower ratings associated with cable television spot advertisements, these advertisements cannot offer a sufficient volume of ratings points, or broad enough household penetration, to provide a viable alternative to broadcast television spot advertising. Because of these limitations, MVPDs and interconnects would be unable to expand output or increase sales sufficiently to defeat a small but significant increase in the prices charged for broadcast television spot advertising in a given DMA.

41. Digital media advertising also is not an effective substitute for broadcast television spot advertising. Digital advertising, such as static and floating banner advertisements, static images, text advertisements, wallpaper advertisements, pop-up advertisements, flash advertisements, and paid search results, lacks the combination of sight, sound, and motion that makes television spot advertising particularly impactful and memorable. Although online video advertisements do allow for a combination of sight, sound, and motion, these advertisements face certain challenges. For example, they can be skipped, minimized, or blocked.

42. Digital advertisements also serve a different purpose from broadcast advertising. Whereas advertisers use broadcast television spots to reach a large percentage of the population in a given DMA to build widespread brand awareness, advertisers use digital advertising to target narrow demographic subsets of a population and often to generate an immediate response to the advertisement.

43. Other forms of advertising, such as radio, newspaper, billboard, and direct-mail advertising, also do not constitute effective substitutes for broadcast television spot advertising. These forms of media do not combine sight, sound, and motion, and they consequently lack television's ability to capture consumers with emotive storytelling. In addition, these forms of media do not reach as many local viewers or drive brand awareness to the same extent as broadcast television does.

44. For all of these reasons, advertisers likely would not respond to a small but significant non-transitory increase in the price of broadcast television spot advertising by switching to other forms of advertising—such as cable, digital, print, radio, or billboard advertising—in sufficiently large numbers to make the price increase unprofitable.

**2. Geographic Markets**

45. For an advertiser seeking to reach potential customers in a given DMA, broadcast television stations located outside of the DMA do not provide effective access to the advertiser's target audience, because their signals generally do not reach any significant portion of the target DMA. Because advertisers cannot advertise on stations outside a DMA to reach viewers inside the DMA, a hypothetical monopolist of broadcast television spot advertising on stations in a given DMA would likely implement at least a small but significant non-transitory price increase.

46. Each of the Overlap DMAs accordingly constitutes a relevant geographic market for the sale of broadcast television spot advertising within the meaning of Section 7 of the Clayton Act, 15 U.S.C. § 18.

**C. Likely Anticompetitive Effects**

47. The chart below summarizes Defendants' approximate market shares and the result of the transaction on the HHIs in the sale of broadcast television spot advertising in each of the Overlap DMAs.

| Overlap DMA | Gray Share | Raycom Share | Merged Share | Pre-merger HHI | Post-merger HHI | HHI Increase |
|---|---|---|---|---|---|---|
| Albany, GA | 11% | 71% | 82% | 5,407 | 7,007 | 1,600 |
| Dothan, AL | 65% | 15% | 80% | 4,866 | 6,778 | 1,912 |
| Toledo, OH | 38% | 37% | 75% | 3,088 | 5,872 | 2,784 |
| Panama City, FL | 54% | 10% | 64% | 4,220 | 5,274 | 1,054 |
| Augusta, GA | 44% | 17% | 61% | 3,695 | 5,197 | 1,503 |
| Tallahassee, FL-Thomasville, GA | 48% | 16% | 64% | 3,267 | 4,759 | 1,492 |
| Odessa-Midland, TX | 30% | 35% | 65% | 2,563 | 4,688 | 2,125 |
| Waco-Temple-Bryan, TX | 41% | 19% | 60% | 2,988 | 4,564 | 1,576 |
| Knoxville, TN | 28% | 10% | 38% | 2,791 | 3,367 | 576 |

48. Defendants' large market shares reflect the fact that, in each Overlap DMA, Gray and Raycom each own at least one Big 4 station, and often own one or more non-Big-4 network affiliates, which also sell spot advertising.

49. As indicated by the preceding chart, the post-merger HHI in each Overlap DMA is well above 2,500, and the HHI increase in each Overlap DMA far exceeds the 200-point threshold above which a transaction is presumed to enhance market power and harm competition. Defendants' proposed transaction is thus presumptively unlawful in each Overlap DMA.

50. In addition to substantially increasing the concentration levels in each Overlap DMA, the proposed merger would combine Gray's and Raycom's Big 4 broadcast television stations, which are close substitutes and generally vigorous competitors in the sale of broadcast

television spot advertising. The merger would also combine the Defendants' non-Big-4 programming streams in the Overlap DMAs, which are also used to sell spot advertising.

51. In each Overlap DMA, Defendants' broadcast stations compete head to head in the sale of broadcast television spot advertising. Advertisers obtain lower prices as a result of this competition. In particular, advertisers in the Overlap DMAs can respond to an increase in one station's spot advertising prices by purchasing, or threatening to purchase, advertising spots on one or more stations owned by different broadcast station groups—"buying around" the station that raises its prices. This practice allows the advertisers either to avoid the first station's price increase, or to pressure the first station to lower its prices.

52. If Gray acquires Raycom's stations, advertisers seeking to reach audiences in the Overlap DMAs would have fewer competing broadcast television alternatives available to meet their advertising needs, and would find it more difficult and costly to buy around higher prices imposed by the combined stations. This would likely result in increased advertising prices.

53. For these reasons, the proposed merger likely would substantially lessen competition in the sale of broadcast television spot advertising in each of the Overlap DMAs, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

## VI. ABSENCE OF COUNTERVAILING FACTORS

54. Entry of a new broadcast station into an Overlap DMA would not be timely, likely, or sufficient to prevent or remedy the proposed merger's likely anticompetitive effects in the relevant markets. The FCC regulates entry through the issuance of broadcast television licenses, which are difficult to obtain because the availability of spectrum is limited and the regulatory process associated with obtaining a license is lengthy. Even if a new signal were to become available, commercial success would come over a period of many years, if at all.

55. Defendants cannot demonstrate merger-specific, verifiable efficiencies sufficient to offset the proposed merger's likely anticompetitive effects.

## VII. VIOLATIONS ALLEGED

56. The United States repeats and realleges the allegations of paragraphs 1 through 56 as if fully set forth herein.

57. The proposed merger of Gray and Raycom likely would substantially lessen competition in interstate trade and commerce, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. The merger likely would have the following effects, among others:

a. competition in the licensing of Big 4 television retransmission consent in each of the Overlap DMAs likely would be substantially lessened;

b. competition between Gray and Raycom in the licensing of Big 4 television retransmission consent in each of the Overlap DMAs would be eliminated;

c. the fees charged to MVPDs for the licensing of retransmission consent in each of the Overlap DMAs and throughout each MVPD's footprint likely would increase;

d. competition in the sale of broadcast television spot advertising in each of the Overlap DMAs likely would be substantially lessened;

e. competition between Gray and Raycom in the sale of broadcast television spot advertising in each of the Overlap DMAs would be eliminated; and

f. prices for spot advertising on broadcast television stations in each of the Overlap DMAs likely would increase.

## VIII. RELIEF REQUESTED

58. The United States requests that:

a. the Court adjudge the proposed merger to violate Section 7 of the Clayton Act, 15 U.S.C. § 18;

b. the Court enjoin and restrain Defendants from carrying out the merger, or entering into any other agreement, understanding, or plan by which Gray would merge with, acquire, or be acquired by Raycom, or Gray and Raycom would combine any of their respective Big 4 stations in the Overlap DMAs;

c. the Court award the United States the costs of this action; and

d. the Court award such other relief to the United States as the Court may deem just and proper.

Dated: December 14, 2018

Respectfully submitted,

FOR PLAINTIFF UNITED STATES OF AMERICA

MAKAN DELRAHIM (D.C. Bar # 457795)
Assistant Attorney General for Antitrust

ANDREW C. FINCH
Principal Deputy Assistant Attorney General

PATRICIA A. BRINK
Director of Civil Enforcement

OWEN M. KENDLER
Chief, Media, Entertainment & Professional Services Section

YVETTE TARLOV (D.C. Bar # 442452)
Assistant Chief, Media, Entertainment & Professional Services Section

MATTHEW SIEGEL
GREGG MALAWER (D.C. Bar # 481685)
United States Department of Justice
Antitrust Division
Media, Entertainment & Professional Services Section
450 Fifth Street, N.W., Suite 4000
Washington, DC 20530
Telephone: (202) 598-8303
Facsimile: (202) 514-7308

# CIVIL COVER SHEET

JS-44 (Rev. 6/17 DC)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| United States of America | Gray Television, Inc.<br>Raycom Media, Inc. |
| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF ______<br>(EXCEPT IN U.S. PLAINTIFF CASES) | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT 88888<br>(IN U.S. PLAINTIFF CASES ONLY)<br>NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |
| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)<br>Matthew Siegel, Antitrust Division, United States Department of Justice, 450 Fifth Street NW, Suite 4000<br>Washington, DC 20530<br>(202) 598-8303 | ATTORNEYS (IF KNOWN)<br>Gray: J. Parker Erkmann, Cooley LLP, 1299 Pennsylvania Ave. NW, Ste. 700, Washington, DC 20004 202-776-2036;<br>Raycom: Gregory Skidmore, Robinson Bradshaw, 101 N. Tryon St., Ste 1900, Charlotte, NC 28246 704-377-8144 |

## II. BASIS OF JURISDICTION

(PLACE AN x IN ONE BOX ONLY)

- ⦿ 1 U.S. Government Plaintiff
- ○ 3 Federal Question (U.S. Government Not a Party)
- ○ 2 U.S. Government Defendant
- ○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES

(PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT

**(Place an X in one category, A-N, that best represents your Cause of Action and one in a corresponding Nature of Suit)**

### ⦿ A. *Antitrust*

- [X] 410 Antitrust

### ○ B. *Personal Injury/ Malpractice*

- 310 Airplane
- 315 Airplane Product Liability
- 320 Assault, Libel & Slander
- 330 Federal Employers Liability
- 340 Marine
- 345 Marine Product Liability
- 350 Motor Vehicle
- 355 Motor Vehicle Product Liability
- 360 Other Personal Injury
- 362 Medical Malpractice
- 365 Product Liability
- 367 Health Care/Pharmaceutical Personal Injury Product Liability
- 368 Asbestos Product Liability

### ○ C. *Administrative Agency Review*

- 151 Medicare Act

**Social Security**

- 861 HIA (1395ff)
- 862 Black Lung (923)
- 863 DIWC/DIWW (405(g))
- 864 SSID Title XVI
- 865 RSI (405(g))

**Other Statutes**

- 891 Agricultural Acts
- 893 Environmental Matters
- 890 Other Statutory Actions (If Administrative Agency is Involved)

### ○ D. *Temporary Restraining Order/Preliminary Injunction*

**Any nature of suit from any category may be selected for this category of case assignment.**

***(If Antitrust, then A governs)***

### ○ E. *General Civil (Other)* OR ○ F. *Pro Se General Civil*

**Real Property**

- 210 Land Condemnation
- 220 Foreclosure
- 230 Rent, Lease & Ejectment
- 240 Torts to Land
- 245 Tort Product Liability
- 290 All Other Real Property

**Personal Property**

- 370 Other Fraud
- 371 Truth in Lending
- 380 Other Personal Property Damage
- 385 Property Damage Product Liability

**Bankruptcy**

- 422 Appeal 27 USC 158
- 423 Withdrawal 28 USC 157

**Prisoner Petitions**

- 535 Death Penalty
- 540 Mandamus & Other
- 550 Civil Rights
- 555 Prison Conditions
- 560 Civil Detainee – Conditions of Confinement

**Property Rights**

- 820 Copyrights
- 830 Patent
- 835 Patent – Abbreviated New Drug Application
- 840 Trademark

**Federal Tax Suits**

- 870 Taxes (US plaintiff or defendant)
- 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**

- 625 Drug Related Seizure of Property 21 USC 881
- 690 Other

**Other Statutes**

- 375 False Claims Act
- 376 Qui Tam (31 USC 3729(a))
- 400 State Reapportionment
- 430 Banks & Banking
- 450 Commerce/ICC Rates/etc.
- 460 Deportation
- 462 Naturalization Application
- 465 Other Immigration Actions
- 470 Racketeer Influenced & Corrupt Organization
- 480 Consumer Credit
- 490 Cable/Satellite TV
- 850 Securities/Commodities/ Exchange
- 896 Arbitration
- 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- 950 Constitutionality of State Statutes
- 890 Other Statutory Actions (if not administrative agency review or Privacy Act)

| ○ G. *Habeas Corpus/ 2255* | ○ H. *Employment Discrimination* | ○ I. *FOIA/Privacy Act* | ○ J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus – General<br>☐ 510 Motion/Vacate Sentence<br>☐ 463 Habeas Corpus – Alien Detainee | ☐ 442 Civil Rights – Employment (criteria: race, gender/sex, national origin, discrimination, disability, age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loan (excluding veterans) |
| ○ K. *Labor/ERISA (non-employment)* | ○ L. *Other Civil Rights (non-employment)* | ○ M. *Contract* | ○ N. *Three-Judge Court* |
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 740 Labor Railway Act<br>☐ 751 Family and Medical Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 440 Other Civil Rights<br>☐ 445 Americans w/Disabilities – Employment<br>☐ 446 Americans w/Disabilities – Other<br>☐ 448 Education | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights – Voting (if Voting Rights Act) |

**V. ORIGIN**

⦿ 1 Original Proceeding ○ 2 Removed from State Court ○ 3 Remanded from Appellate Court ○ 4 Reinstated or Reopened ○ 5 Transferred from another district (specify) ○ 6 Multi-district Litigation ○ 7 Appeal to District Judge from Mag. Judge ○ 8 Multi-district Litigation – Direct File

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**

Clayton Act Section 7, 15 U.S.C. § 18. Suit to enjoin the merger of two television broadcasting companies.

**VII. REQUESTED IN COMPLAINT** — CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 ☐ — **DEMAND $** — **JURY DEMAND:** Check YES only if demanded in complaint YES ☐ NO ☒

**VIII. RELATED CASE(S) IF ANY** (See instruction) YES ☐ NO ☒ If yes, please complete related case form

**DATE:** 12/14/2018 **SIGNATURE OF ATTORNEY OF RECORD** [signature]

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
**Authority for Civil Cover Sheet**

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and services of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the cover sheet.

I. COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff if resident of Washington, DC, 88888 if plaintiff is resident of United States but not Washington, DC, and 99999 if plaintiff is outside the United States.

III. CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV. CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of the case.

VI. CAUSE OF ACTION: Cite the U.S. Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII. RELATED CASE(S), IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.